UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:05CV-67-R

POLYONE CORPORATION                                                                                         PLAINTIFF

v.

WESTLAKE VINYLS, INC.                                                                                        DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion to Dismiss (Docket #3). Plaintiff filed a response (Docket #4) to which Defendant has replied (Docket #5). This matter is now ripe for adjudication. For the reasons that follow, Defendant's Motion to Dismiss is GRANTED.

**BACKGROUND**

The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq.*, is a comprehensive regulatory program designed to promote the safe handling of solid and hazardous wastes. *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1190. Under RCRA, persons treating, storing, or disposing of hazardous waste must obtain a permit to do so. 42 U.S.C. § 6925(a). As RCRA is amended by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), permittees are also required to perform corrective action for releases from solid waste management units ("SWMUs") and other areas of concern ("AOCs") at a site. 42 U.S.C. § 6924(u). While the United States Environmental Protection Agency ("EPA") has primary responsibility for implementing RCRA's directives, the states may enact their own hazardous waste regulatory programs. 42 U.S.C. § 6926(b). If a state elects to enact its own program meeting minimum federal standards and applies for and receives approval from the EPA, then the state program operates in lieu of the federal program. *Id.* Because it was approved by the EPA, Kentucky is authorized to

implement RCRA standards through its own regulatory program. 50 Fed. Reg. 2550 (1985). Under RCRA and under Kentucky's authorized program, a hazardous waste disposal facility must submit and receive approval from the Commonwealth of Kentucky of its Part A and Part B permit application to become fully licensed to operate. *LWD*, 60 F.3d at 1190.

In the 1950s, the BF Goodrich Corporation ("Goodrich") installed a chemical manufacturing unit in Calvert City, Marshall County, Kentucky, to produce vinyl chloride monomer ("VCM"). Goodrich later constructed another plant at the site to manufacture ethylene dichloride ("EDC"). These two plans are known collectively as the EDC/VMC Plant. In the 1960s, Goodrich constructed an ethlene plant and a chloride plant at the site (collectively referred to as "the CA&O Plant"). Goodrich's operations at the site produced a variety of waste materials, including EDC, VCM, benzene, and mercury. Until the mid-1980s, these hazardous wastes were disposed of by, among other things, burning them in burning pits or placing them in unlined earthen ponds. Among the earthen ponds utilized by Goodrich over the years to receive hazardous waste were ponds 1A, 2, and 4.

In 1980, the EPA promulgated hazardous waste regulations pursuant to RCRA requiring Goodrich to notify EPA of its hazardous waste activities and to file a Part A application. On November 13, 1980, Goodrich submitted a Part A application that identified Pond 4 as a regulated unit because it received, stored, and treated hazardous waste.

In the mid-1980s, Goodrich closed its surface impoundments at the site, including Pond 4, pursuant to a closure plan approved by Kentucky EPA. As Goodrich elected to close the regulated units before being issued a Part B permit, it was required to obtain a post-closure Part B permit encompassing any surface impoundment, landfill, or similar land disposal unit that received

hazardous waste after July 26, 1982, and was not closed clean. The post-closure Part B permit also contained applicable corrective action requirements. On September 29, 1989, the Kentucky EPA and the US EPA issued a RCRA Part B post-closure permit for the closed units and required Goodrich to begin groundwater treatment at the site.

In March 1990, Westlake Vinyls, Inc. purchased the EDC/VCM plants from Goodrich. As an integral part of this sale, Westlake purchased the SWMUs and AOCs connected with the EDC/VCM plants. Westlake submitted a Part A application to the regulatory agencies that gave notification of the location of its waste facility and a general description of its hazardous waste management activities.

In March 1993, Goodrich divested its Geon Vinyl Division by taking it public. This resulted in the formation of Geon Company, Inc., which was a publicly traded company on the New York Stock Exchange. In 2000, Geon consolidated with the M.A. Hanna Corporation and formed PolyOne Corporation. PolyOne is a publicly traded company listed on the New York Stock Exchange.

Goodrich renewed its RCRA post-closure permit in 2003, and since then the parties have filed four administrative actions challenging Goodrich's permit. On October 29, 2003, Goodrich filed the first administrative action (DWM 26420-039), in which Goodrich challenged the Cabinet's designation of Goodrich as the proper permittee on the facility's renewed RCRA post-closure permit. In its petition, Goodrich claims that Westlake, not Goodrich, should hold the permit because Westlake bought all the major chemical manufacturing operations at the Site and owns most of the real property where the SWMUs and AOCs are located. In November 2003, PolyOne filed a petition (DWM 26458-039) that generally followed the arguments of Goodrich's petition. In count I of its

administrative petition, PolyOne requested that the Cabinet, as alternative relief, issue Westlake a separate RCRA permit if the Cabinet did not add Westlake to Goodrich's permit. PolyOne alleges that multiple releases by Westlake at the facility since 1990 require it to be subject to a RCRA permit. The Cabinet demanded that Westlake submit a permit application because of its post-1997 ownership of Pond 4. On February 6, 2004, Westlake filed an administrative action challenging the Cabinet's finding that Westlake should be named as the owner or operator of Pond 4 for purposes of RCRA post-closure activities. In October 2004, PolyOne filed another administrative action in which it challenged the Cabinet's decision to name PolyOne as an "operator" on Goodrich's permit. On March 18, 2005, the Cabinet Hearing Officer consolidated all four actions.

PolyOne filed the instant action, a citizen-suit enforcement action under RCRA, on March 23, 2005.

**DISCUSSION**

Examination of the abstention issue begins "with the fundamental proposition that abstention is a limited exception to the 'virtually unflagging' obligation of federal courts to exercise the jurisdiction given them." *MacDonald v. Village of Northport*, 164 F.3d 964, 968 (6th Cir. 1999) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 817, (1976)). Westlake argues that, notwithstanding this heavy presumption, abstention is appropriate in this case under the doctrine announced in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). This basis for abstention is "concerned with potential disruption of a state administrative scheme." *AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004). Specifically, *Burford* dealt with a challenge brought in federal court to an order of the Texas Railroad Commission granting a permit to drill oil wells. The *Burford* court emphasized that the state of Texas had a significant economic interest in the regulation

4

of its oil wells and noted the constant and complex balancing of the various individuals' interests that the Texas regulatory authority was required to engage in to make the system work. It also discussed the fact that the Texas state courts were "working partners" with the regulatory authority "in the business of creating a regulatory system for the oil industry." *Burford*, 319 U.S. at 326. The court went on to observe that, when federal courts had exercised jurisdiction to review orders of the regulatory authority, their lack of specialized knowledge and differing interpretation of state statutes had contributed significant confusion to the system. *Id.* at 329. Ultimately, the court held that "[u]nder such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand." *Id.* at 334.

In later cases, the Supreme Court further developed the *Burford* abstention doctrine, summarizing it as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) *(*quoting *Colorado River Water Conservation Dist.*, 424 U.S. at 814). The court in *NOPSI* made it quite clear that the *Burford* abstention doctrine "does not require abstention whenever there exists [a complex state administrative process], or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* at 362. In that case, the court distinguished between the federal law claim before it and "a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors," noting that the former "would

5

not disrupt the State's attempt to ensure uniformity in the treatment of an essentially local problem." *Id.* (internal quotation marks and citation omitted). Ultimately, it held, *Burford* abstention was not justified.

Defendants rely principally upon a case in which the Sixth Circuit Court of Appeals addressed the issue of *Burford* abstention with respect to a claim brought under the citizen suit provisions of the RCRA in Kentucky. *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir. 1995). In that case, the plaintiffs brought suit in federal court against the owner of a hazardous waste disposal facility and the secretary of Kentucky's Cabinet for Natural Resources, alleging that the company had violated the RCRA by failing to operate with a permit and the Secretary had violated the RCRA by failing to require the company to acquire a permit. The court found that "Kentucky has an overriding interest in the protection of its environment from the effects of unregulated hazardous waste as indicated by its enactment of a broad statutory scheme and review process governing the issuance and approval of permits for hazardous waste facilities." *Id.* at 1195. In light of this program, which incorporated the RCRA provisions, the court determined that "plaintiffs' claims could not arise in isolation from state law issues nor were they premised solely on alleged violations of federal law." *Id.* The court held that the district court should have dismissed the plaintiffs' claims without prejudice under the *Burford* abstention doctrine, stating that "federal adjudication of plaintiffs' claims . . . would be disruptive of Kentucky's attempt to ensure uniformity in its hazardous waste policy." *Id.*

In *Ellis v. Gallatin Steel Co.*, the Sixth Circuit considered whether *Burford* abstention applied to plaintiffs' claims that the Kentucky Division of Air Quality failed to require a steel mill and its associated slag processing facility to obtain an air permit for their cumulative air emissions. 390

F.3d 461, 478 (6th Cir. 2004). The Sixth Circuit characterized the plaintiffs' permit claims as boiling down to allegations that the Kentucky agency failed to apply or misapplied its lawful authority under Kentucky law and the CAA. *Id.* at 481. The Sixth Circuit held that the claims must be dismissed under *Burford*, explaining:

> [T]he question in this case is not whether citizens may sue companies that fail to obtain a PSD permit; they may and *Burford* abstention rarely will present an obstacle to those claims. The question here is whether a PSD permit was required (and what type of permit was required) in the setting of these associated plants. All we thus decide in this unusual context--where the state has supplied a concentrated and comprehensive review process that is currently addressing the very subject of these federal claims–is that *Burford* counsels abstention.

*Id*.

Here, PolyOne seeks a decision by this Court requiring Westlake to obtain a Part B RCRA permit. PolyOne states that it has sought relief from EPA and the Commonwealth of Kentucky to redress this matter, but the regulatory agencies of these governmental bodies have not commenced and are not diligently prosecuting an action against Westlake for its continuing violations of RCRA. However, the parties are currently involved in administrative proceedings at the state level focused on the issue of whether Westlake is required to obtain an RCRA permit. As part of those proceedings, Polyone has asserted that multiple releases by Westlake at the Facility since 1990 require it to be subject to a RCRA permit. Hence, the subject of PolyOne's federal claims are currently being addressed by Kentucky's comprehensive environmental review process. In light of Kentucky's "enactment of a broad statutory scheme and review process governing the issuance and approval of permits for hazardous waste facilities", *Burford* counsels abstention, as "federal adjudication of PolyOne's claims would be disruptive of Kentucky's attempt to ensure uniformity in its hazardous waste policy." *LWD*, 60 F.3d at 1195; *see Ellis*, 390 F.3d at 481;

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss is GRANTED.

An appropriate order shall issue.